UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JASON SETH PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-02305-JPH-MPB |
| | ) | |
| J. SNYDER, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFF'S CROSS MOTIONS FOR SUMMARY JUDGMENT, AND
DIRECTING FURTHER PROCEEDINGS**

Jason Perry, an Indiana inmate, brought this action pursuant to 42 U.S.C. § 1983 alleging that the defendants were deliberately indifferent to the known risk that he would be attacked and failed to protect him from attack by another inmate. Defendants have moved for summary judgment, and so has Mr. Perry.[1] For the following reasons, the defendants' motion for summary judgment is granted. Mr. Perry's motion for summary judgment is denied and Mr. Perry will be directed to show why the defendants should not be granted summary judgment on his retaliation claim.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the

---

[1] Perry moved to supplement his cross-motion for summary judgment twice, dkt. 176, 187. Accordingly, the Court will consider the most recent motion, dkt. 187, when ruling on the cross-motions for summary judgment.

record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh

Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson,* 477 U.S. at 255.

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II. Facts

The facts are evaluated pursuant to the standards set forth above and considered undisputed except to the extent that disputes are noted.

In 2009, while incarcerated at Wabash Valley Correctional Facility ("WVCF"), Mr. Perry was attacked by a member of the Aryan Brotherhood. Dkt. 144-2 at 34. According to Mr. Perry, the attack was the result of the Aryan Brotherhood having "put a hit on [him]" because he helped "bust several inmates in those gangs" when he was at Pendleton Correctional Facility. *Id.* at 92 (Ex. H-7).

Since then, Mr. Perry has made numerous allegations of being threatened by other inmates, guards, and prison medical personnel, and requested protective custody on numerous occasions. He also has suffered from and been treated for mental health conditions.

In May of 2014, while incarcerated at the Reception Diagnostic Center ("RDC"), Mr. Perry was placed in protective custody after alleging that a "hit" had been placed on him by the Aryan Brotherhood.  Dkt. 166 at 87–88 (Ex. G-4; G-5); 93 (Ex. H-4); Dkt. 189 ¶ 18; dkt. 190 at 91.

In 2016, Perry was transferred to WVCF, where he was placed in segregation.[2] Dkt. 144-1 at 12-13.[3] On March 30, 2016, WVCF staff Rob Marshall and Jerry Snyder exchanged emails regarding whether Perry should be managed to the prison's general population. Dkt. 144-2 at 1. Perry was released to the prison's general population, but in April 2016 he requested protective custody and was returned to segregation. Dkt. 144-1 at 15. On April 11, 2016, Snyder noted that Perry had agreed to general population and would be released that day. Dkt. 144-2 at 2.

In late April, Perry sought to be returned to protective custody.  Dkt. 144-2 at 13.  On May 4, 2016, Marshall sent an email to various facility staff and medical staff regarding Perry's request. The email included a summary of Perry's history of reporting threats and requesting protective custody, stated that Perry was not appropriate for general population, and discussed options for where he could be housed:

> Got an interesting situation. Inmate Jason Perry #138926 was recently released from CCU on April 11, 2016 after returning to the IDOC from being out to court for about nine months. Prior to going to court, offender Perry resided in CCU. He

---

[2] The parties do not explain the differences between the units discussed in their motions for summary judgment. But based on their discussion of these units, the terms "CCU" and "segregation" are understood to refer to units that enforce significant restrictions on inmates' movements, while units such at EHU and FHU are understood to be general population units.

[3] References to Perry's deposition are to the page of the deposition transcript, not to the page of the filing in CM/ECF. In addition, Perry submits a number of challenges to the propriety of his deposition, including that the court reporter did not begin with an on-the-record statement in compliance with Rule 30(b)(5)(A) of the Federal Rules of Civil Procedure, that he was denied lunch, and that his request for an extension of the deposition was denied. Dkt. 189 ¶¶ 2-6. The Federal Rules of Procedure provide that a deposition cannot be used if it is taken on short notice and the party objects to the notice. Fed. R. Civ. P. 32(a)(5)(A). While Perry states he was only given 13 days' notice of the deposition, dkt. 189 ¶ 44, his motion for an extension of the deposition stated only that he had a court hearing the day of his deposition, dkt. 77. Further, that motion was granted to the extent that the Court acknowledged that if he was at a court hearing, he could not be deposed. Dkt. 87. He presented no other objections to the notice of the deposition before the deposition. Accordingly, the deposition may be used as evidence in support of the defendants' motion for summary judgment.

was managed into CCU on October 27, 2016 [sic] due to requesting protective custody. He had been assigned to CCU many times prior, for a variety of reasons. Throughout his entire incarceration he has requested protective custody multiple times, claiming that his safety has been jeopardized. Although he has never been officially managed into a protective custody unit, he claims specific gang members are out to get him for being a confidential informant, staff are conspiring to harm him, and the food is being poisoned in an attempt to rape all offenders as they sleep. He claims he has been raped by staff, but then recanted and advised PREA Compliance Staff that he had only been having dreams about being raped, and did not believe that he was actually raped.

Based on Oct. 2014 we [IDOC] really did not know what to do with him. His thought process doesn't appear to be rational. So, we managed him in CCU.

Perry was managed back into the IDOC on March 22, 2016. Managed to general population on April 11, 2016 (his request) and requested protective custody once again on April 26, 2016. This time he fears staff are out to get him, for various unsubstantiated reasons.

As you can see from Former Casework Manager Jim Linneweber's summation (attached), offender Perry does not seem appropriate for general population. There is also information from Shannon Roden identifying offender Perry's Paranoid Personality Disorder, Antisocial Personality Disorder and Depression. Offender Perry has NEVER maintained in a general population setting, ever! He couldn't even maintain at RDC without filing for PC. Is it possible to get him re-evaluated to see if he is appropriate for SNU or perhaps the SNAP Unit. There appears to be some MH history with this offender.

I too have met with this offender, and do not find hi[s] management in GP conducive.

*Id.* at 3.

On May 10, 2016, Marshall sent an email to facility staff regarding the plan for responding

to Perry's most recent request for protection:

Please advise offender Perry that I have received ALL of his correspondences. I plan to investigate his allegations. Unfortunately, due to training and other obligations, his investigation has been pushed to the back burner. We will get to him as soon as we can. Advise him to be patient.

*Id.* at 9.

On May 12, 2016, Marshall sent an email to various facility staff and medical staff, noting,

"I plan to meet with [Perry] today and make a management recommendation or request further

MH review." *Id.* at 11. That same day, Marshall initiated the investigation of Perry's request for protective custody with an email to facility staff: "This is a PC investigation of Jason Perry. Please assign accordingly. I'm going to attach a bunch of e-mails pertaining to this below. Bottom line, this guy probably is not appropriate for GP, but MH does not believe he is appropriate for SNU or SNAP." *Id.* at 13.

On June 1, 2016, Marshall sent an email to facility and medical staff with O.I.I.'s recommendations:

> Jason Perry 138925…..**6/10/16**……B-213 (may have a pc request being investigated) – It is unlikely that offender Perry will maintain anywhere in GP at WVCF. He is convinced that offenders and staff are out to get him. He did file a PC request, of which this office was unable to substantiate his allegations. We did request a MH evaluation. If MH cannot provide a management recommendation, we will re-visit.

*Id.*

On June 2, 2016, Perry submitted a request for protection claiming that he was "sought after by numerous gangs such as Aryan Brotherhood and Gangster Disciples . . . ." Dkt. 144-1 at 44-46; dkt. 144-3. In a request for interview dated June 3, 2016 to Frank Littlejohn, Perry noted, among other things, that he wanted to be placed on "long-term P/C." Dkt. 144-4. That same day, Marshall, Snyder, and Frank Littlejohn received an email exchange from facility staff stating that Perry's recent request for protective custody had been denied, and that he had submitted another request that morning. Dkt. 144-2 at 18.

On June 7, 2016, Marshall and Snyder received an email from Investigator Robert Storm with findings from an investigation into Perry's request for protective custody, concluding that the allegations had not been substantiated. Perry had told investigators that a correctional officer had threatened him and called him a snitch, and that prison staff were going to kill him.  Perry did not want to take his medications because he feared that prison medical staff would try to kill him by

poisoning his medications. He also reported that other inmates were trying to kill him by poisoning his food. Storm also observed that Perry appeared to be suffering from mental health issues. He recommended that Perry not be returned to the general population and that he receive a mental health evaluation. Dkt. 144-2 at 19-20.

On June 8, 2016, medical staff advised Marshall and Snyder that Perry was back on medications for anxiety and paranoia. Dkt. 144-2 at 21.

On June 9, 2016, Snyder responded to Perry's request for interview, and suggested to Perry that he should sign a waiver:

> We are presently reviewing your Request for Protection but I will tell you the Office of Investigation and Intelligence recommends denial. I have been advised you would sign a waiver to go to EHU. Is there any other housing unit you would agree to? If we simply deny the PC request, you would be subject to move to any housing unit, so if you offer more choices by signing a waiver, it would be in your best interest.

Dkt. 144-4.[4]

Perry claims he signed this waiver after Snyder threatened Perry with placement in any housing unit if he didn't sign. Dkt. 144-4; dkt. 144-1 at 49. Later, on July 27, Perry requested to throw away this "waiver" because he was tricked and refused to sign the protective custody denial. Dkt. 166-2 at 15 (A-15), 92 (H-7).

On June 14, 2016, Snyder received an email recommending that Perry's request for protection be denied. Dkt. 144-2 at 22. On June 29, 2016, Snyder received an email from facility mental health staff which noted:

> Per your request – Mr. Perry continues to be paranoid and adamantly believe others in GP are planning to hurt him. He has a long history of believing this and filing

---

[4] Perry contends that this statement conflicts with Snyder's sworn statement that he cannot place an offender on protective custody. Dkt. 189 ¶ 33. But this statement does not indicate that Snyder has sole authority to place someone on protective custody. Further, Perry states that this statement was threatening to him. *Id.* But a review of the statement does not indicate that it conveys a threat, but only an attempt at a discussion regarding what housing units Perry would consider requesting.

> PC due to being scared and fearful that others are going to harm him. His current
> mental health symptoms are consistent with his diagnosis of Paranoid Personality
> Disorder. As this time he does not need a mental health unit, however his belief that
> others are planning to harm him has caused him significant distress.

*Id.* at 23.

On July 20, 2016, Snyder and Marshall received an email in which facility mental health staff reported that Perry was calm, amenable to taking antipsychotic medications, and that he was ready to return to general population, although preferably EHU. *Id.* at 25-26.

On July 21, 2016, Marshall forwarded the same email to facility staff, noting that while Perry was not promised placement in EHU, the Office of Internal Investigations was not opposed to such placement. *Id.* at 25. On the same day, Marshall was advised that if Perry were placed in EHU, that placement would be temporary. *Id.* at 28. Also, on July 21, 2016, mental health staff advised Marshall of their recommendation that "Mr. Perry does not need a mental health unit." *Id.* at 24 (emphasis in original). On the same day, Snyder received an email from facility staff noting, "Let me know what, when and where for him. He will have to sign the pc waiver before leaving." *Id.* at 24.

On July 22, 2016, Perry signed a Request to Leave Self-Lockup, State Form 8063R. Dkt. 144-1 at 49; dkt. 144-5.[5] The Request form states in relevant part:

> I . . . am hereby requesting to be released from self-lockup protective status in order that I
> may re-enter the general offender population. I do so voluntarily and of my own free will,
> without any threats, promises, undue influence, or coercion of any kind.

Dkt. 144-5. On the same day, Frank Littlejohn denied Perry's June 2 request for protection. Dkt. 144-1 at 45-45; dkt. 144-3. The reason for the denial was: "PC denied, signed waiver." Dkt. 144-3.

---

[5] Perry asserts that he was tricked into signing a waiver. Dkt. 189 ¶ 26. He states that he asked in his grievance to throw away this form because he believed he was going to a protective custody dorm. *Id.*

On July 27, 2016, less than a week after returning to the general population, Perry requested to be returned to protective custody. As part of this request, Perry submitted an "emergency grievance" alleging that he had been threatened that day by gang members with whom he had problems in the past; that his life was in danger; and that he had been tricked into signing a waiver of protective custody with a false promise that he would be sent to a particular dorm where he thought he would be safe. Dkt. 144-6.

On August 1, 2016, the facility's grievance specialist—Teresa Littlejohn—denied Perry's grievance, noting that "…the offender signed a waiver. He did so on his own, without any promises as to what housing unit he would be assigned to. Both parties contacted indicate that they feel the offender is not in any immediate danger. The offender can file a new PC Request and it will be processed accordingly." Dkt. 144-7. Perry appealed this decision. *Id*. On August 16, 2016, Linda VanNatta denied Perry's grievance appeal, noting, among other things, that facility staff was aware of his concerns, that he did not appear to be in danger, and that he could submit another PC request. *Id*.

Marshall and Snyder were informed of the "Emergency Grievance."  Dkt. 144-2 at 31. Marshall responded: "Just another ploy. However, as I've said many time[s], this offender is not mentally stable." *Id*. In another email chain dated July 28, 2016, Marshall noted: "Ignorant! I tried to tell MH that he wouldn't go to GP. He's not right, mentally." *Id*. at 32.

On August 8, 2016, Perry submitted another request for protection, noting, in part, "I have been threatened by two gang members on my range. Jimmy Barrett (Aryan) and Jerry Plemmons (Maniac Latin Disciple) have threatened my life." Dkt. 144-1 at 47-48; dkt. 144-8.

On August 11, 2016, Snyder sent the following email to Marshall and other facility staff: "Surprise!! He has filed again with allegations that STG's have threatened his life. Please advise

9

when time permits. Thank you." Dkt. 144-2 at 33. Marshall responded: "Lisa Isberg is going to recommend MH Unit placement tomorrow. Good luck, Lisa." *Id.*

Facility mental health staff asked if there was any merit to Perry's allegations. *Id.* Marshall responded:

> We have not investigated these latest claims. However, we have no proof that he has been threatened, and no evidence to suggest that these two organizations are after him. Now, with that being said, it is likely that these two offenders have communicated threats to him, but we cannot prove this. In a restricted environment inmates threaten one another daily. However, that doesn't mean that it's an STG issue and/or concern.
>
> Even after investigating I highly doubt that his allegations will be substantiated. Or, to the degree that suggests entire organizations are after him.

*Id.*

Also on August 11, 2016, facility mental health staff asked about Perry's claimed history of being threatened and assaulted. *Id.* at 34. Marshall responded with a detailed report of Perry's history of reporting threats on his life and an incident in 2009 where Perry was attacked:

> Yes, offender Perry was seriously assaulted by a former cellmate, while incarcerated here at WVCF. This occurred in 2009. The assailant was a member of the Aryan Brotherhood, but is no longer here at this facility. At the time Perry was assaulted he and his cellmate were on ICARSH, due to Perry having flu like symptoms, during the swine flu pandemic. He did not have the swine flu. It was never proven why he was assaulted, but believed it was because his cellmate endured sharing a cell with him while allegedly having the swine flu.
>
> When we investigated this matter, Perry told us four different stories of why he was assaulted. None of them were true. He even told us that he was a probate for the Aryan Brotherhood, and his cellmate assaulted him because he dropped out. That was a total lie. When confronted about this, he admitted he lied about being an AB probate. He then claimed that he testified against members of the AB. Which, was another lie. The stories just went on and on.[6]

---

[6] Perry states that Marshall stated in his Interrogatories that he never met Perry face to face. But the Interrogatory response says, when asked if he ever met with Perry face to face "I do not recall." Dkt. 166-2 p. 72. Whether or not Perry and Marshall met face to face, Marshall may still have a record of past investigations of Perry's requests for protective custody.

He was involved in another offender on offender altercation in October 2014. The other person involved is still located at WVCF, but not affiliated with an STG. It was determined that Perry was the aggressor in this incident. However, during the altercations, Perry sustained the most injuries. They were not life threatening or serious injuries. Immediately after engaging in this altercation, Perry went on suicide watch.

While researching my records, I found that my past interactions with Perry, from several years ago, did include information about his food being poisoned, and that WVCF Staff are retaliating against him for his committed crime. None of this was ever substantiated, nor had merit. Additionally, I have recommended him time and time again for MH placement. I fully believe he will never maintain in GP without being properly medicated or in a treatment unit.

*Id.* at 34.

On August 17, 2016, Marshall received an email from facility mental health staff informing him that Perry had been involuntarily medicated and asking whether Perry's request for protective custody had been approved. *Id.* at 39. On the same day, Marshall, Snyder, and Frank Littlejohn received a report of facility staff's interview with Perry. *Id.* at 38. Perry had told them he believed that his food was being poisoned by food service staff. *Id.* The report also stated that "[w]hile speaking with Offender Perry today he did not report having any issues with staff and/or offenders." *Id.* Marshall informed mental health staff that investigators had interviewed Perry, they were not able to substantiate his allegations, that Perry believed his food was being poisoned. He concluded that

Until he can comprehend that no one is out to harm him, related to his food being poisoned or because of his committed crime, I do not believe GP is suitable management for him. He will only resubmit PC paperwork and be brought right back to CCU.

*Id.*

On August 22, 2016, Snyder received an email from Lisa Isberg, a member of the facility mental health staff, stating that Perry was ready to be returned to the general population from a treatment perspective. *Id.* at 36. Marshall responded:

I agree. If he is willing to go to GP, then we can try it. I don't know what else to do with him. Hopefully, the medication will work.

Thanks again for your continued efforts in getting him appropriately managed.

*Id*. at 37.

On August 25, 2016, Perry signed a Request to Leave Self-Lockup, State Form 8063R. Dkt. 144-9; dkt. 144-1 at 49-50.[7] On the form, Perry requests to go to "D-dorm" because "that is the only dorm I'll make it in safely." Dkt. 144-9. Perry claims that he thought this meant he would go to D Dorm, which is where he stayed at WVCF in protective custody last time. Dkt. 144-1 at 52–53. He further claims that Defendant Frank Littlejohn granted protective custody for D Dorm for him last time. *Id*.

On August 26, 2016, Frank Littlejohn denied Perry's August 8 request for protection. Dkt. 144-1 at 46-47; dkt. 144-8. The basis for the denial was: "Offender signed waiver. PC denied." Dkt. 144-8.

On August 26, 2016, Marshall, Snyder, and Frank Littlejohn were included in an email chain regarding Perry's housing placement, in which facility staff noted that Perry was being submitted for DHU general population. Dkt. 144-2 at 40. Facility mental health staff also stated, "He is also on involuntary medications now, which has led to a significant reduction in aggressiveness and paranoia." *Id*.

On November 23, 2016, Perry submitted another request for protection, stating:

I was called out of my cell by Ricky Beaver (cell 414) and was taken to 420 where Tim Miller (420) and another black inmate 318 (who is covered in tattoos and talks with a whisper). They all threatened me saying I am a chicken bitch and should not

---

[7] Perry testified at his deposition that the name at the top of this form was "forged," but he admits that he signed at the bottom. Dkt. 144-1 at 48-51, 53-55. Perry states that his name and DOC number were written by someone else on the "Request to Leave Self-Lockup" forms where he is supposed to print. Dkt. 166-1 ¶ 30.

have got into it with Tim Miller the night before. They were telling me to [illegible] in or I will be dealt with accordingly. I am in fear of my life.

Dkt. 144-10; dkt. 144-1 at 15, 65.

On November 30, 2016, Frank Littlejohn denied his request: PC Denied – Offender signed a waiver." Dkt. 144-10. Perry denies having signed this waiver. Dkt. 189 ¶ 7.

On February 1, 2017, Perry was housed in L Dorm, in cell number 420.[8] Dkt. 144-1 at 25. For one month, Perry had a roommate named Travis Funke. *Id.* at 26. Funke was part of the Ku Klux Klan. *Id.* at 79. Before February 1, 2017, Perry twice asked his counselor—Kelly Swayze— to be moved out of the cell with Funke because Funke had been threatening Perry. *Id.* at 69-70. Perry also talked to Officer Ranard and one other officer, whose name he does not remember, about talking to the counselor so that he could get moved out of the cell. *Id.* at 70-72. On February 1, 2017, Funke assaulted Perry in their shared cell. Dkt. 47 at 3-4. Prior to the February 1 attack, Perry had not talked to any of the defendants about concerns regarding Funke or requesting protection from the Ku Klux Klan. Dkt. 144-1 at 79. Funke was not one of the individuals who threatened Perry while he was in segregation between April and September of 2016. *Id.* at 41.

Perry received a conduct report for the incident on February 1, 2017, and was found guilty of fighting. *Id.* at 89, 91; dkt. 144-11.

Perry states that Funke attacked him because he was told by the Aryan Brotherhood that Perry is a snitch. Dkt. 166-1 ¶ 62; dkt. 167 ¶ 36.

---

[8] Perry contends that he was "strategically" placed next to certain offenders and Disciple gang members and Aryan Brotherhood gang members which is supposed to be protected from which he "let all Defendants know." Dkt. 189 ¶¶ 21, 22. But the statement that this was a "strategic" placement is not supported by evidence. The defendants also argue that it is immaterial because Perry was attacked by Travis Funke, who was a member of the Ku Klux Klan, not the Gangster Disciples or Aryan Brotherhood. Dkt. 144-1 at 79.

### III. Discussion

The parties seek summary judgment on Perry's Eighth Amendment deliberate indifference claim. Perry also seeks summary judgment on a First Amendment retaliation claim.

#### A. Deliberate Indifference

Under the Eighth Amendment, prison officials have a duty to "'take reasonable measures to guarantee the safety of inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 1 (1992)). But not every harm caused by another inmate results in liability under the Eighth Amendment. *Id*. at 834. To prevail on an Eighth Amendment claim, a plaintiff must demonstrate two elements: (1) "he is incarcerated under conditions posing a substantial risk of serious harm;" and (2) the defendant knew about the risk of harm, but disregarded that risk. *Id*. at 837. Thus, a claim that a prison official was deliberately indifferent to such a risk has both an objective and a subjective component. *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer,* 511 U.S. at 837 (1994)). First, the harm to which the prisoner was exposed must be an objectively serious one. *Farmer*, 511 U.S. at 847. Next, the official must have known about the risk and failed to take reasonable measures to abate it. *Id.*; *see also Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006).

The defendants do not dispute that Perry suffered serious harm when he was assaulted by Mr. Funke. Defendants argue that they were not deliberately indifferent because they did not have actual knowledge of a "grave risk" to Perry posed by Funke. Perry contends that the defendants were aware of the risk of harm to him because he filed multiple requests for protective custody and because officials at RDC placed him in protective custody during his time there. A prisoner's "complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the

14

prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Gevas*, 798 F.3d at 481.

Here, the defendants have shown that they were not aware of any specific threat posed to Perry by Funke. In the requests for protection filed by Perry in June, August, and November 2016, Perry did not identify Funke or the Klu Klux Klan as threats to him. Dkt. 144-1 at 79-80; dkts. 144-3, 144-8, 144-10. Perry's most recent request for protection, filed on November 23, 2016, alleged that he had been threatened by other inmates for having "gotten into it with Tim Miller". Dkt. 144-10; dkt. 144-1 at 15, 65. He did not allege that either individual was affiliated with a gang or that the threat was in any way related to a previous attack or threat. *Id.* While Perry notified other prison officials that Funke was threatening him, he did not talk to any of the named defendants in this case about any concerns about Funke, dkt. 144-1 at 79, and there is no evidence that the defendants otherwise had knowledge of the threats. There is therefore no evidence that the defendants were aware of a threat posed to Perry by Funke.

That defendants were not aware of a specific threat by Funke, however, does not foreclose liability because "'[i]t is well settled' that plaintiffs can adequately establish deliberate indifference in circumstances where 'the *specific* identity of the ultimate assailant is not known in advance of the assault.'" *Sinn v. Lemmon*¸ 911 F.3d 412, 421 (7th Cir. 2018) (quoting *Brown v. Budz*, 398 F.3d 904, 915 (7th Cir. 2015) (emphasis in *Brown*)). Perry argues that the defendants knew that he was at serious risk of harm because he had previously been placed in protective custody, had written multiple requests for protective custody, and was part of an identifiable group of people prone to attack by other offenders. Dkt. 189 ¶¶ 17; 19. But "the fact that an inmate sought and was denied protective custody is not dispositive of the fact that prison officials were therefore deliberately indifferent to his safety." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997).

Further, "[j]ust because a correctional officer knows an inmate has been branded a snitch—and it's common knowledge that snitches face unique risks in prison—does not mean that an officer violates the Constitution if the inmate gets attacked." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (citing *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008)).

To assess whether officials were aware of a threat, the Seventh Circuit "consider[s] the context of the perceived threat as a whole, and whether the evidence, circumstantial, documentary or otherwise, was sufficient to indicate that the officials were aware of the substantial risk. That can be shown in a variety of ways, including but not limited to, an articulation of a specific threat, the obviousness of a risk, or the realities of prison gang conduct." *LaBrec v. Walker*, No. 18-1682, 2020 WL 400195 (7th Cir. Jan. 24, 2020). So "the specificity of the inmate's complaint [is] but one part of the greater analysis regarding the defendants' subjective knowledge." *Sinn¸* 911 F.3d at 421. As the vagueness of a threat increases, the likelihood of "actual knowledge of impending harm" decreases. *See Fisher v. Lovejoy,* 414 F.3d 659, 662 (7th Cir. 2005).

Here, Perry had made numerous prior requests for protective custody alleging that he had been threatened by other inmates and groups, and that prison medical and food service staff were going to or trying to kill him by poisoning his food and medicine. Prison staff reviewed and responded to Perry's requests and allegations by moving him out of the general population, interviewing Perry, investigating the allegations, and seeking mental health evaluation and treatment. Officials who interviewed Perry about those requests asked him if he had received specific threats, but he did not provide specific information. *See* Dkt. 144-2 at 19 ("While questioning Perry, he kept repeating 'they're going to poison me' or 'staff is going to kill me.'" I asked him who he was referring to. He could not provide any names. By his own admission, offender Perry stated that no one had threatened him since 2009."). Prison staff and investigators

16

were not able to substantiate any of Perry's allegations. *Id.* at 19-20, 34, 38. And nothing in Perry's most recent request for protection regarding inmates Beaver and Miller gave defendants notice that Funke presented a specific risk to Perry or that an attack was likely to occur. The defendants' responses to Perry's requests were sufficient. *See Giles v. Tobeck*, 895 F.3d 510, 513 (7th Cir. 2018).

The defendants further argue that Perry signed Requests to Leave Self-Lockup and that he agreed to the denial of protective custody in response to his request made in November. Perry argues that this is "not a waiver of protective custody," dkt. 189 ¶ 24, and that he never signed a waiver of protective custody.  As discussed above, however, Perry has not designated evidence showing a nexus between the denial of protective custody in November and the attack in February. There is therefore no evidence to support Perry's claim that the denial of protective custody based on the waiver amounted to deliberate indifference. Moreover, as previously discussed, Perry's other requests for protective custody were investigated and could not be substantiated.

In short, the defendants have shown that they were not deliberately indifferent to any risk to Perry. There is no evidence that they were aware of a specific threat from the inmate who assaulted Perry. In addition, prison officials responded to Perry's requests for protective custody and allegations of threats. And, though his last request was denied based on a waiver Perry contends that he did not sign, the defendants did not have any reason to suspect that it was not Perry's signature on the waiver. Perry has not designated evidence showing that any of the defendants had actual knowledge of grave risk to Perry.

This conclusion also applies to Perry's claims against defendants VanNatta and Teresa Littlejohn. These defendants argue that because they only reviewed his grievances, they were not personally involved in the alleged failure to protect him from harm. But there are situations in

which grievance officials may have been deliberately indifferent to a risk to a prisoner if they failed to investigate his grievances. *Cf. Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015). Here, however, the undisputed evidence reflects that both VanNatta and Teresa Littlejohn investigated Perry's grievances. Teresa Littlejohn denied Perry's grievance appeal, explaining that the parties she contacted did not believe he was in any immediate danger. Dkt. 144-7. In denying his appeal, VanNatta noted staff was aware of his concerns and that he did not appear to be in any danger. *Id.* Further, as with the other defendants, there is not a connection between Perry's complaints in August of 2016, when VanNatta and Teresa Littlejohn reviewed his grievances, and the attack on February 1, 2017. Thus, Perry has not shown that VanNatta and Teresa Littlejohn were deliberately indifferent to a serious risk of harm to him.

For these reasons, the defendants are entitled to summary judgment on Perry's deliberate indifference claims.

## B. Retaliation

In support of his cross-motion for summary judgment, Perry seeks summary judgment on First Amendment retaliation claims. The defendants argue that because a First Amendment claim was not identified in the Court's screening order, dkt. 46, no First Amendment claim is proceeding in this case. Perry claimed in his amended complaint that the defendants' actions amounted to retaliation in violation of his First Amendment rights. Dkt. 47. But, the defendants are correct that the Court's screening order did not identify a First Amendment claim. Furthermore, the screening order directed Perry to notify the Court if he stated a claim that it had not identified. Dkt. 8. And when the Court allowed Perry to amend his complaint, it noted that the claims would continue to proceed as screened in the original screening order. Dkt. 46.

At any rate, Perry is not entitled to summary judgment on his retaliation claim. To prevail on a First Amendment retaliation claim, a plaintiff must show that "(1) []he engaged in activity protected by the First Amendment; (2) []he suffered a deprivation that would likely deter First Amendment activity; and (3) the protected activity []he engaged in was at least a motivating factor for the retaliatory action." *Archer v. Chisholm*, 870 F.3d 603, 618 (7th Cir. 2017) (internal citations omitted).

Perry bases his retaliation claim on the same facts on which his deliberate indifference claims are based. He contends that the defendants retaliated against him for filing grievances by failing to protect him and by failing to investigate his protective custody requests quickly enough. Perry's claims satisfy the first and second elements of a retaliation claim. Filing grievances is a protected First Amendment activity. *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) ("A prisoner has a First Amendment right to make grievances about conditions of confinement."). In addition, assault from another inmate, or placing an inmate in segregation, are the types of actions that can deter future First Amendment activity. *See McKinley v. Schoenbeck*, 731 Fed. App'x 511, 515 (7th Cir. 2018) ("A beating … would deter an ordinary person from exercising his or her First Amendment rights."); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) (placement in long-term segregation may support a retaliation claim).

But Perry has failed to show that his grievances were a motivating factor in either allegedly leaving him subject to assault by another inmate or in placing him in segregation while his protective custody requests were considered. To prove a case of First Amendment retaliation, an inmate must show that his protected activity was the cause of the retaliatory action. *Archer*, 870 F.3d at 618. An inmate makes out a prima facie cause of retaliation if he shows that his "protected activity was 'at least a motivating factor' for the retaliatory action." *Thomas v. Anderson*, 912 F.3d

971, 976 (7th Cir. 2018)). Suspicious timing can be evidence of a causal connection, but "[t]emporal proximity" on its own "is ordinarily not sufficient to establish causation." *McKinley v. Schoenbeck*, 731 Fed. App'x 511, 514 (7th Cir. 2018). "[A] causal connection can then be demonstrated by suspicious timing alone only when the . . . action follows on the close heels of protected expressions." *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (addressing First Amendment retaliation claim in employment context). If Perry can demonstrate that retaliation was at least a "motivating factor" in the retaliatory action, "[t]he burden then shifts to the defendants to show that they would have taken the action despite the bad motive." *May v. Springborn*, 719 F.3d 631, 635 (7th Cir. 2013). In other words, the defendant can rebut the plaintiff's prima facie case of retaliation "by showing that his conduct was not a necessary condition of the harm – the harm would have occurred anyway." *Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011).

Here, the only evidence Perry has that the defendants retaliated against him is the timing between his grievances and the denials of his protective custody. Perry filed grievances regarding his protective custody requests in July of 2016. Dkt. 144-2 at 31; dkt. 144-6. He submitted a renewed request for protective custody on August 8, 2016, and then a request to leave self-lockup on August 25, 2016. Dkt. 144-9; dkt. 144-1 at 49-50. Thus, with regard to Perry's August 8, 2016 request for protective custody, even though it was somewhat close in time to his grievances, the defendants can rebut any presumption of retaliatory animus because the denial of this request was "standard procedure" based on his request to leave self-lockup. *See Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987). While Perry asserts that he misunderstood the purpose of this form, there is no evidence that the defendants were aware at that time that Perry did not agree to leave segregation.

Perry filed another protective custody request on November 23, 2016, which Littlejohn denied on November 30, 2016: "PC denied – Offender signed a PC waiver." Dkt. 144-10. This denial was several months after Perry's July grievances. The timing of this denial is therefore not sufficient to show a causal connection between Perry's grievances and the denial of protective custody. *See Daza*, 941 F.3d at 309. The Seventh Circuit "typically allow[s] no more than a few days to elapse" for actions to qualify as coming "on the close heels" of protected expression, although this is a "context-specific analysis with no formal legal rule." *Id.* While temporal proximity alone is not sufficient to establish causation, *McKinley*, 731 Fed. App'x. at 514, here there is not even such suspicious timing. With respect to his July grievances, Perry has not made the showing necessary to shift the burden to the defendants to show that they would have denied the grievance absent any bad motive.

In short, Perry has failed to show that the defendants retaliated against him by denying his protective custody requests. He is therefore not entitled to summary judgment on this claim. Further, the Court finds that, to the extent that Perry stated a retaliation claim, the current record before the Court demonstrates that the defendants are entitled to summary judgment on this claim. Perry will therefore be given the opportunity to show why the defendants should not be granted summary judgment on his retaliation claim.

## IV. Conclusion and Further Proceedings

For the foregoing reasons, the defendants' motion for summary judgment, dkt. [143], is **GRANTED**. Perry's cross motion for summary judgment, dkt. [165], and motion to enforce cross-motion for summary judgment, dkt. [229], are **DENIED**. The motion to supplement cross motion for summary judgment, dkt. [176], is **DENIED as moot** because Perry filed a further motion to supplement, dkt. [187], which is **GRANTED** only to the extent that the evidence and arguments

in that motion were considered. Similarly, the motions to supplement, dkt. [216], dkt. [217], and dkt [220], are **GRANTED** to the extent that the evidence presented in those motions was considered.

The current record before the Court shows that the defendants are entitled to summary judgment on Perry's retaliation claim. Therefore, pursuant to Rule 56(f)(1), the Court gives Perry notice of its intent to grant summary judgment in the defendants' favor on this issue. Perry has **through November 5, 2020**, in which to respond to the Court's proposal. The defendants will have fourteen days to reply to Perry's response.

**SO ORDERED.**

Date: 10/7/2020

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

JASON SETH PERRY
138925
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All Electronically Registered Counsel